# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
### EASTERN DIVISION

| | | |
|---|---|---|
| **PETER KADELAK** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **v.** | ) | **Case No. 10 C 6021** |
| | ) | |
| **MICHAEL J. ASTRUE,** | ) | **Magistrate Judge Morton Denlow** |
| **Commissioner of Social Security,** | ) | |
| | ) | |
| **Defendant.** | ) | |

## MEMORANDUM OPINION AND ORDER

Claimant Peter Kadelak ("Claimant") brings this action under 42 U.S.C. § 405(g), seeking reversal or remand of the decision by Defendant Michael J. Astrue, Commissioner of Social Security ("Defendant" or "Commissioner"), denying Claimant's application for Disability Insurance Benefits ("DIB"). In response, the Defendant filed a motion to affirm the Commissioner's decision. Claimant raises the following issues in support of his motion for summary judgment: (1) whether the ALJ improperly discounted Claimant's allegations of knee pain without ordering further medical tests; (2) whether the ALJ improperly considered Claimant's pension in the credibility finding; (3) whether the ALJ improperly considered Claimant's lack of treatment in the credibility finding;(4) whether the ALJ failed to consider Claimant's obesity in combination with his other impairments; and (5) whether the ALJ failed to consider the entire record. For the following reasons, the Court denies

Claimant's motion for summary judgment and grants Defendant's motion to affirm the Commissioner's decision.

## I. BACKGROUND FACTS

### A. Procedural History

Claimant initially filed for DIB on August 9, 2007, alleging a disability onset date of January 5, 2007. R. 109–16. The Social Security Administration ("SSA") denied his application on November 1, 2007. R. 60–62. Claimant then filed a request for reconsideration, which the SSA denied on January 25, 2008. R. 65–69. Thereafter, Claimant requested a hearing before an ALJ. R. 71–72.

On July 27, 2009, Administrative Law Judge Mona Ahmed (the "ALJ") presided over a hearing at which Claimant appeared with his attorney, John Horn. R. 23–57. Claimant and Lee Knutson, a vocational expert, testified at the hearing. No medical expert testified. On November 23, 2009, the ALJ issued a decision finding that Claimant was not disabled under the Social Security Act. R. 8–19. Specifically, the ALJ found that Claimant had "the residual functional capacity to perform medium work exertionally" and that "there are jobs that exist in significant numbers in the national economy that the claimant can perform." R. 14, 18.

Claimant then filed for a review of the ALJ's decision to the Appeals Council. R. 6. On July 27, 2010, the Appeals Council denied review, making the ALJ's decision the final decision of the Commissioner. R. 1–4. Claimant subsequently filed this action for review

pursuant to 42 U.S.C. § 405(g).

**B.    Hearing Testimony—July 27, 2009**

**1.    Peter Kadelak—Claimant**

At the time of the hearing, Claimant was 62 years old, married, and living with his wife and son. R. 28–29. Claimant is a high school graduate and a Vietnam War veteran. R. 30. His most recent gainful employment ended in January 2007, when he stopped working as a hotel maintenance worker. R. 31. Claimant often performed repairs on ceilings, requiring him to carry and climb ladders. R. 32. He lifted more than 100 pounds occasionally and twenty-five pounds frequently, and was on his feet for the entire workday. R. 44–46. Claimant took early retirement because of back and knee pain. R. 31. Claimant receives a pension. R. 30.

Claimant testified that he could not work mainly because of back pain. R. 45. He stated that his back hurts when he stands for more than two hours and sometimes when he sits or lays down. R. 34, 44. His thighs also become numb from the back pain. R. 39. He estimated that he can lift fifty pounds once or twice and five to ten pounds repeatedly, but his back "starts bothering [him] real bad" when he tries to lift more. R. 32–33. On a scale of one to ten, Claimant rated his daily back pain as a four. R. 44. When the pain flares up, the pain rates as an eight and lasts for two days. *Id.* Claimant saw a chiropractor and family doctor about his back problem. R. 33. His family doctor recommended surgery but Claimant

refused because of previous problems with anesthesia. *Id.* Claimant tries to exercise every day but when he has back pain, he exercises once or twice a week. R. 33–34.

Claimant also testified that knee pain prevented him from working. R. 31, 45. Claimant rated his knee pain as a four on a scale of one to ten, possibly reaching six or seven if he "walk[s] a lot or climb[s] stairs." R. 45. There are no recent x-rays of his knees. R. 41. Before the hearing, Claimant had requested that the ALJ order x-rays of Claimant's right knee if social security disability benefits were not granted. R. 202.

Claimant was diagnosed with diverticulosis in 2003 or 2004. R. 35. He testified that during an attack he may go to the restroom four or five times a day. R. 39. The attacks last a week to a week and a half and occur one to two times per month. R. 40. Claimant fell behind in work during the attacks. *Id.*

Claimant testified about various joint problems, including trigger finger in his left hand, carpal tunnel syndrome, and shoulder problems. R. 35–36, 42. Claimant explained that the trigger finger symptoms act up at night and in the morning. R. 45–46. The doctor administers cortisone injections which eliminate the symptoms, but Claimant can only receive three shots per year. R. 35–36, 46. When the trigger finger acts up, Claimant is unable to use his hand for the day. R. 36. His family doctor diagnosed him with carpal tunnel syndrome. R. 35–36. Claimant stated that his hands get numb and painful at night, preventing him from sleeping. R. 36. When he performs small tasks, like peeling a potato, his carpal tunnel acts up for four to five days. *Id.*

Claimant also listed a number of other medical problems. He has a history of kidney stones. R. 36–38. Since January 5, 2007, he passed three stones and last passed one-and-a-half years ago. R. 37, 39. Claimant gets migraines once or twice a month . R. 41. The migraines last for thirty to forty-five minutes and lead Claimant to lose half of his field of vision. R. 41–42. Claimant had a blood clot in his right leg and triple hernia, but both of these conditions were treated. R. 42–43. Claimant continues to wear a compression hose when he drives, as recommended by his doctor. R. 43. The doctor diagnosed Claimant with diabetes in March 2009. R. 35. As treatment, Claimant takes a pill daily and checks his blood three times per week. *Id.*

As for his daily activities, Claimant has a driver's license, owns a car, and drives once or twice a day. R. 29–30. He has driven up to 200 miles round trip in the last year and drove thirty minutes to the hearing. R. 30. Claimant spends the day watching TV. R. 34. He does not cook, do many chores, or make repairs around the house. R. 32, 34. Instead, Claimant's wife does the chores and his son helps with household repairs. R. 32, 34. Claimant had undertaken a home repair project in which he mainly supervised his son in laying a hardwood floor. R. 53. He wore knee pads to take measurements but did not cut or carry the wood. R. 54. At one point, Claimant and his wife cared for their son's girlfriend's five-year-old daughter for two weeks. R. 46–48. Claimant mainly watched TV with the child. R. 55.

## 2. Mr. Lee Knutson—Vocational Expert ("VE")

The Vocational Expert, Lee Knutson, described Claimant's past relevant work as a maintenance engineer, which he categorized as a skilled position requiring a 'medium' level of exertion, though Claimant performed it at a 'heavy' level.[1] R. 49. There were no jobs available at light or sedentary levels that contain transferable skills. *Id.* The ALJ asked whether someone with the age, education, and work experience of the Claimant could continue working as a maintenance engineer if limited to medium work; standing and walking for six hours with regular breaks; never climbing ladders, ropes or scaffolds; and only occasional kneeling, crouching, crawling, and stooping. R. 50. The VE responded that he could not. *Id.*

The ALJ asked the VE if there were any other occupations such a hypothetical person could do. *Id.* The VE stated that the hypothetical person could work as a bagger, a cleaner, or a hand packer. *Id.* If Claimant were limited to lifting fifteen pounds occasionally the packer job would be eliminated. R. 50–51. The VE also identified four limitations that would each preclude the hypothetical person from any of the three jobs he identified: lifting no more than ten pounds frequently, standing no more than two hours per day, remaining productive less than 85% of the time, or missing two or more days per month. R. 51–52.

## C. Medical Evidence

---

[1] Medium work is defined as lifting no more than 50 pounds at a time with frequent lifting or carrying of objects weighing up to 25 pounds. 20 C.F.R. § 404.1567(c). Heavy work is defined as lifting no more than 100 pounds at a time with frequent lifting or carrying of objects weighing up to 50 pounds. 20 C.F.R. § 404.1567(d).

### 1. Kidney Stones

Claimant sought treatment for kidney stones in 2006.  R. 212.  Claimant's CT scan in August 2006 confirmed that he had bilateral renal stones, but the "tiny stones" did not appear in Claimant's kidney ultrasound.  R. 217–18.  In March 2007, Claimant had another CT scan which confirmed multiple bilateral renal stones and a cyst on his right kidney.  R. 216, 238.  There was no evidence of hydronephrosis,[2] meaning there was no loss of function due to obstruction of free flow from the kidney.  *Id.*  A March 24, 2009 report from Claimant's primary doctor, Dr. Bernice Salazar, states that his kidney stone condition was asymptomatic.  R. 330.  Claimant's April 2009 CT scan again showed the presence of renal stones but no hydronephrosis.  R. 274, 334.  As a result of Claimant's "abnormal CT" and history of renal stones and cyst, Dr. Salazar referred Claimant to a urology clinic in May 2009.  R. 288.  Claimant cancelled his appointment.  R. 288–89.

### 2. Lower Back Pain

Claimant sought treatment from a chiropractor for back pain.  R. 259–60.  He visited her about once every two months from September 2006 to December 2007.  R. 225–26, 260. Claimant's family physician ordered an MRI of Claimant's back on September 17, 2007. R. 241.  The MRI showed that Claimant had mild diffuse disc bulges in two portions of his spine, and also had "at most mild" foraminal[3] narrowing in his spine.  *Id.*

---

[2] Hydronephrosis is a kidney condition caused by the accumulation of urine resulting in an obstruction of the flow of urine from the kidney, leading to kidney atrophy and cyst formation. *Merriam-Webster's Medical Dictionary* (2007).

[3] A foramen is a small opening in a bone. *Merriam-Webster's Medical Dictionary* (2007).

### 3. Consultative Examination by Dr. Dinesh Jain—October 9, 2007

Dr. Dinesh Jain examined Claimant on behalf of a state agency on October 9, 2007. R. 255–58. Dr. Jain noted no clinical evidence of lumbar neuropathy in Claimant's lower extremities. R. 257. Finger dexterity and pulses in the arms were also normal. *Id.* Claimant had no problem squatting and rising, no loss of motor function, a normal gait, and normal range of motion of the lumbar spine as well as of the upper and lower extremities. *Id.* There was no swelling in any joints. *Id.* The doctor's diagnostic impression was that Claimant had lumbosacral[4] pain with a history of disc disease, mild degenerative joint disease of the bilateral knees, asymptomatic for diverticulosis at the present time, and no clinical neuropathy in the hands. R. 257.

### 4. State Agency Medical Consultants

Claimant's medical file was reviewed by two state agency medical consultants: Dr. Virgilio Pilapil and Dr. Ernst Bone. In October 2007, Dr. Pilapil opined that Claimant was capable of medium exertion work: lifting 50 pounds occasionally and twenty-five pounds frequently; standing and walking six hours in an eight-hour workday; and sitting six hours of the workday. R. 243. Dr. Pilapil concluded that Claimant did not have any postural limitations. R. 244. He relied on Claimant's October 9, 2007 examination with Dr. Jain in reaching his conclusion. *Id.* On January 18, 2008, Dr. Bone affirmed Dr. Pilapil's opinion.

---

[4] Lumbosacral relates to the part of the spinal cord that connects to the pelvis. *Merriam-Webster's Medical Dictionary* (2007).

R. 262–63.  In addition to the evidence cited by Dr. Pilapil, Dr. Bone also cited an MRI of Claimant taken on September 17, 2007.  R. 241, 263.

### 5.    Rheumatology Consultation with Dr. Lee Lichtenberg—October 9, 2008

In September 2008, Claimant visited Dr. Salazar and complained of chronic left finger pain, which he claimed had lasted for two and a half months.  R. 298, 374–76.  Dr. Salazar referred Claimant to Dr. Lee Lichtenberg for a rheumatology consult.  R. 376.  Claimant visited Dr. Lichtenberg on October 9, 2008 to treat the trigger finger symptoms.  R. 298–300, 372–74.  Claimant complained about trigger finger pain in the third and fifth digit of his left hand.  R. 298–99.  Claimant stated he experienced intermittent severe pain that resolved spontaneously after an hour.  R. 299.  Claimant also reported a constant pain in those digits at a three to four level on a one to ten scale.  *Id.*  Claimant had previously had similar pain in his right hand that was successfully treated with a steroid injection.  *Id.*  Claimant was diagnosed with stenosing tenosynovitis[5] and treated with a steroid injection in his left hand.  R. 300.

During this examination Claimant also complained about knee pain.  R. 299.  Claimant had crepitus[6] in his right knee, but no effusion, and all lower extremities had full range of motion.  R. 300.

### 6.    Deep Venous Thrombosis and Diabetes

---

[5] Tenosynovitis is the inflammation of the sheath that surrounds a tendon.  *Merriam-Webster's Medical Dictionary* (2007).

[6] Crepitus describes the grating or crackling sounds and sensations such as that produced by fractured bones moving against each other.  *Merriam-Webster's Medical Dictionary* (2007).

Claimant was diagnosed with acute deep vein thrombosis ("DVT") and type 2 diabetes in November 2008. R. 308, 360–63. Claimant reported that calf pain started after he had laid hardwood floors for three days. R. 361–62. The DVT was treated with a blood thinner and compression stockings. R. 324–25, 355. The blood thinner was stopped in May 2009. R. 321. The diabetes was treated with oral medication and diet. R. 316–17.

Claimant met with primary care physician, Dr. Bernice Salazar, on March 24, 2009, as a follow up to his DVT treatment. R. 329–33. Claimant's edema had resolved itself, and he denied leg pain. R. 330. He had been wearing very tight knee pads at the time that the DVT had initially occurred, and Claimant felt that might have caused the problem. *Id.*

### 7.    Obesity

Claimant's weight bordered on obesity during the period from 2007 to 2009.[7] During Claimant's October 9, 2007 examination with Dr. Jain, he weighed 195 pounds. R. 256. In June 2008, Claimant was diagnosed as obese at 201 pounds. R. 301, 382–83. At that visit, Claimant reported that his physical activity included thirty minutes on the treadmill and thirty minutes on a bike each day. R. 302. From that point on, Claimant has consistently weighed in below his 200-pound cut-off for obesity. He weighed 195 pounds on July 18, 2008 and 194 pounds on October 9, 2008. R. 341. From June 2008 to February 2009, Claimant also regularly visited a dietician who provided him with a diet plan. R. 301–03, 316–17, 340–42.

---

[7] The National Institute of Health established that a Body Mass Index (BMI) of 30.0 or above qualifies as obesity. SSR 02-1p. At 5'8", Claimant would be considered obese at 200 pounds or above.

Claimant weighed 191 pounds by March of 2009 and 188 pounds by June of that year. R. 316, 331.

**D.    The ALJ's Decision—November 23, 2009**

After a hearing and review of the medical evidence, the ALJ determined Claimant had the residual functional capacity ("RFC")[8] to perform a significant number of jobs in the national economy and therefore denied his application for DIB. R. 8–19.  The ALJ evaluated Claimant's application under the required five-step sequential analysis.  At step one, the ALJ found Claimant had not engaged in any substantial gainful activity since January 5, 2007, the alleged onset date. R. 13.  At step two, the ALJ found Claimant had the severe impairments of mild degenerative disc disease, presumed arthritis of the right knee, and tenosynovitis of the left hand.  *Id.*  At step three, the ALJ found Claimant did not have an impairment or combination of impairments that meets or medically equals one of the impairments listed in 20 C.F.R. Pt. 404, Subpt. P, App. 1.  *Id.*

The ALJ then proceeded to consider Claimant's RFC and found Claimant capable of performing medium work, provided that the work did not involve climbing ladders, ropes or scaffolds, and only occasionally involved kneeling, crouching, crawling, or stooping. R. 14. The ALJ found Claimant's medically determinable impairments could reasonably be expected to cause the alleged symptoms, but concluded that Claimant's statements regarding

---

[8] The RFC is the most that a claimant can do despite the effect of his impairments.  20 C.F.R. § 404.1545(a).

the intensity, persistence, and limiting effects of these symptoms were not entirely credible. R. 15.

The ALJ discounted Claimant's back issues. The ALJ relied in particular on Dr. Jain's examination of October 23, 2007, which she characterized as "unremarkable" and without signs of serious back problems. *Id.* Likewise, two state medical consultants reviewed Claimant's medical history, including an MRI of Claimant's back, and did not see any remarkable abnormalities. R. 16. The ALJ also noted that Claimant had received little treatment or drugs for his back pain. R. 17. The ALJ gave some weight to Claimant's testimony about back pain by including in the RFC finding postural limitations not recommended by the medical consultants. R. 16.

The ALJ also discussed Claimant's various other medical issues. Concerning Claimant's knee problems, the ALJ found a limited history of medical treatment for Claimant's knees. *Id.* Claimant had been diagnosed with diabetes in November 2008, which he treated with oral medication and diet. *Id.* The ALJ found that Claimant had urinary stones and diverticulosis, but both appeared to be asymptomatic. R. 15–16. The ALJ also noted that Claimant drives once or twice every day, exercises regularly, laid hardwood floors recently, and is active around the house. R. 16–17.

At step four, the ALJ concluded Claimant could not perform his past relevant work as a maintenance engineer/mechanic. R. 17. At step five, the ALJ considered whether Claimant had the RFC, work experience, and education to find work in a new job. R. 18.

Relying on the VE's testimony, the ALJ determined that Claimant could work as a bagger, a cleaner, or a hand packer, and that significant numbers of these jobs existed in the national economy. *Id.* The ALJ therefore concluded that Claimant was not disabled under the Social Security Act. R. 19.

## II. LEGAL STANDARDS

### A. Standard of Review

The "findings of the Commissioner of Social Security as to any fact, if supported by substantial evidence, shall be conclusive." 42 U.S.C. § 405(g). A decision by an ALJ becomes the Commission's final decision if the Appeals Council denies a request for review. *Sims v. Apfel*, 530 U.S. 103, 106–07 (2000). Under such circumstances, the district court reviews the decision of the ALJ. *Id.* The reviewing court may enter judgment "affirming, modifying, or reversing the decision of the [Commissioner], with or without remanding the cause for a rehearing." 42 U.S.C. § 405(g).

Substantial evidence is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales*, 402 U.S. 389, 401 (1971). A "mere scintilla" of evidence is not enough. *Scott v. Barnhart*, 297 F.3d 589, 593 (7th Cir. 2002). Even when the record contains adequate evidence to support the decision, the findings will not be upheld if the ALJ does not "build an accurate and logical bridge from the evidence to the conclusion." *Berger v. Astrue*, 516 F.3d 539, 544 (7th Cir. 2008). If the

Commissioner's decision lacks evidentiary support or adequate discussion of the issues, it cannot stand. *Villano v. Astrue*, 556 F.3d 558, 562 (7th Cir. 2009).

Though the standard of review is deferential, a reviewing court must "conduct a critical review of the evidence" before affirming the Commissioner's decision. *Eichstadt v. Astrue*, 534 F.3d 663, 665 (7th Cir. 2008). It may not, however, "displace the ALJ's judgment by reconsidering facts or evidence, or by making independent credibility determinations." *Elder v. Astrue*, 529 F.3d 408, 413 (7th Cir. 2008). Thus, judicial review is limited to determining whether the ALJ applied the correct legal standards and whether substantial evidence supports the findings. *Nelms v. Astrue*, 553 F.3d 1093, 1097 (7th Cir. 2009).

**B.      Disability Standard**

Disability insurance benefits are available to a claimant who can establish he is under a "disability" as defined by the Social Security Act. *Liskowitz v. Astrue*, 559 F.3d 736, 739–40 (7th Cir. 2009). "Disability" means an "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected . . . to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A). An individual is under a disability if he is unable to perform his previous work and cannot, considering his age, education, and work experience, partake in any gainful employment that exists in the national economy. 42 U.S.C. § 423(d)(2)(A). Gainful

employment is defined as "the kind of work usually done for pay or profit, whether or not a profit is realized." 20 C.F.R. § 404.1572(b).

A five-step sequential analysis is utilized in evaluating whether a claimant is disabled. 20 C.F.R. § 404.1520(a)(4)(i–v). The ALJ must inquire, in the following order: (1) whether the claimant is engaged in substantial gainful activity; (2) whether the claimant has a severe impairment; (3) whether the claimant's impairment meets or equals a listed impairment; (4) whether the claimant can perform past relevant work; and (5) whether the claimant is capable of performing other work. *Id.* Once the claimant has proven he cannot continue his past relevant work due to physical limitations, the ALJ carries the burden to show that other jobs exist in the economy that the claimant can perform. *Schmidt v. Astrue*, 496 F.3d 833, 841 (7th Cir. 2007).

## III. DISCUSSION

Substantial evidence supported the ALJ's decision in this case. She relied on uncontradicted opinion evidence that Claimant could work. Nonmedical evidence further supports the ALJ's finding. Claimant engaged in a wide range of physical activities during the alleged disability period, including exercising thirty minutes on a treadmill and thirty minutes on a bike each day. Despite Claimant's allegations of worsening back and knee problems, Claimant has taken no pain medication and received minimal treatment for these issues.

Claimant nevertheless argues that the ALJ committed several reversible errors, and he raises the following issues in support of his motion: (1) whether the ALJ improperly discounted Claimant's allegations of knee pain without ordering further medical tests; (2) whether the ALJ improperly considered Claimant's pension in the credibility finding; (3) whether the ALJ improperly considered Claimant's lack of treatment in the credibility finding;(4) whether the ALJ failed to consider Claimant's obesity in combination with his other impairments; and (5) whether the ALJ failed to consider the entire record. At oral arguments held on July 18, 2011, Claimant argued that the ALJ's failure to order additional x-rays of Claimant's knee is the principal issue in the case.

**A.     The ALJ Properly Assessed Claimant's Credibility and Sufficiently Developed the Record.**

An ALJ's credibility determinations deserve special deference, because only the ALJ observes the claimant testify. *Jones*, 623 F.3d at 1160. Rather than nitpicking for inconsistencies or contradictions, courts are to give a commonsense reading to an ALJ's opinion and to reverse credibility determinations "only if they are patently wrong." *Id.* Applicants for disability benefits have an incentive to exaggerate their symptoms, so an ALJ may discount an applicant's testimony based on other evidence in the case. *Johnson v. Barnhart*, 449 F.3d 804, 805 (7th Cir. 2006). Even so, an ALJ may not reject an applicant's complaints of pain solely based on the lack of medical evidence. 20 C.F.R. § 404.1529(c)(2).

**1.     The ALJ Validly Weighed Claimant's Allegations of Knee Pain Without Ordering Additional Medical Tests.**

The ALJ's credibility determination here was not patently wrong. Claimant contends that the ALJ erroneously discounted Claimant's allegations of knee pain based solely on a lack of objective medical evidence. But, pursuant to 20 C.F.R. § 404.1529(c)(3), the ALJ specifically considered factors outside of medical evidence, such as Claimant's daily activities, medication, and treatment history. R. 14–17. For instance, the ALJ noted that Claimant engages in a wide range of daily activities, including regular exercise.[9] R. 17. Working out daily for thirty minutes on a treadmill and another thirty minutes on a bike is not the mark of a severely impaired knee. The ALJ remarked that while Claimant appeared to understate his household activities by claiming that his wife did most chores while he watched TV, Claimant's overall activity level "do[es] not suggest that his impairments are very limiting." *Id.* As discussed further below, the ALJ also noted that Claimant does not take any pain medication and received minimal treatment for his knee problem. *Id.*

Even though she had good reason to discount the allegations, the ALJ did not completely dismiss Claimant's complaints of pain. The ALJ gave weight to Claimant's testimony about his knee and back problems by including in the RFC finding postural limitations not recommended by state medical agency consultants. R. 15–16. In light of the various factors that contributed to the ALJ's credibility determination, the Court cannot say that the finding was "patently wrong."

---

[9] The ALJ cited to Ex. 10F/38, 77 in which it is reported that Claimant's "[p]hysical activity consists of 30 minutes on the treadmill and 30 minutes biking each day" and "30–45 minutes on the treadmill 7 days/week." R. 302, 341.

Claimant argues that the ALJ should have ordered x-rays pursuant to 20 C.F.R. § 404.1519a(b)(5) before discounting Claimant's allegations of knee pain, particularly as Claimant's knee condition changed in 2008. That regulation requires an ALJ to order a consultative examination if "[t]here is an indication of a change in [the claimant's] condition that is likely to affect [the claimant's] ability to work, but the current severity of [the] impairment is not established." *Id.* Claimant identifies this issue as the crux of the case. While the ALJ has a duty to develop a full and fair record, the Court will determine that the ALJ failed her duty only when there is a significant omission from the record. *Nelms*, 553 F.3d at 1098. An omission is significant when it is prejudicial, and Claimant must set forth specific facts that the ALJ did not consider to show prejudice. *Id.* As the Seventh Circuit has remarked, "[I]t is always possible to do more. How much evidence to gather is a subject on which district courts must respect the [Commissioner's] reasoned judgment." *Kendrick v. Shalala*, 998 F.2d 455, 458 (7th Cir. 1993). By contrast, the ALJ may order a consultative exam when "the evidence as a whole, both medical and nonmedical, is not sufficient to support a decision on [the] claim" or when there is a change in Claimant's condition that affects his ability to work and "the current severity of [Claimant's] impairment is not established." 20 C.F.R. § 404.1519a(b).

Here, the ALJ comprehensively considered the medical and nonmedical evidence relating to Claimant's knee problems. The ALJ cited Claimant's October 2007 consultative examination with Dr. Jain, who reported that Claimant had no problem squatting and rising,

no loss of motor function, a normal gait and a normal range of motion in his upper and lower extremities. R. 15. Claimant complained of knee pain, and Dr. Jain concluded that Claimant had mild degenerative joint disease of the bilateral knees. R. 257. Dr. Jain reached this conclusion without need for further testing. State medical agency consultants, Dr. Pilapil and Dr. Bone, agreed with Dr. Jain's medical assessment, and determined that Claimant could perform medium work. R. 16. In fact, Claimant conceded during oral argument that there was no substantial evidence of disability as of the October 2007 visit with Dr. Jain.

Claimant contends that his knee condition changed in 2008, thereby requiring the ALJ to order x-rays to assess the current severity of his problem pursuant to 20 C.F.R. § 404.1519a(b)(5). Claimant has the burden of demonstrating that the change in condition affected his ability to work, and he simply did not present any evidence supporting this claim. The ALJ acknowledged that Claimant developed crepitus in the right knee in 2008, after Dr. Jain's examination. But crepitus is merely a cracking or popping sound, and does not necessarily indicate a decrease in functional ability. Claimant did not receive significant treatment or medication for his knee pain and maintained a wide range of daily activities, including exercising for an hour or more daily. R. 16–17, 302. Claimant was also diagnosed with deep vein thrombosis, a type of blood clot, in 2008, but Claimant admitted that wearing tight kneepads when renovating his house precipitated the only documented occurrence of thrombosis. *Id.* Though Claimant regularly visited the Hines Veterans Affairs ("VA") Hospital in 2008, he did not receive treatment for his leg outside of the DVT diagnosis, nor

did those doctors find it necessary to x-ray his knee. R. 265–394. In short, Claimant has failed to produce evidence that a change in condition required the ALJ to order new knee x-rays. Substantial medical and nonmedical evidence supported the ALJ's finding, and the ALJ adequately developed the record.

### 2. The ALJ Properly Considered Claimant's Pension.

Claimant next argues that the ALJ improperly speculated that Claimant's income from his pension "likely affects his motivation to work." R. 17. Claimant focuses on the word "likely" to contend that the ALJ improperly proceeded on speculation rather than evidence. Claimant's argument is misplaced. The ALJ discussed Claimant's pension in the context of evaluating nonmedical factors to determine Claimant's credibility. R. 17. This section of the ALJ's decision opens with, "In addition to the objective evidence and medical opinions, the other factors mentioned above are considered in evaluating the claimant's allegations." *Id.* The decision then discusses Claimant's treatment history and daily activities before mentioning Claimant's good work history and his pension. The regulations allow the ALJ to consider various factors, including Claimant's prior work record, in assessing credibility. 20 C.F.R. § 404.1529(c)(3). Here, the ALJ pointed out that longstanding medical problems did not prevent Claimant from working until he became eligible for a pension, which undoubtedly removed at least some of Claimant's financial incentive to work. The ALJ appropriately considered Claimant's work record and current source of income as one of many factors in the credibility determination.

Claimant relies on a Seventh Circuit case to contend that the ALJ inappropriately speculated about Claimant's motivation to work. *Wilder v. Chater* held that the ALJ inappropriately rejected medical testimony because of a "hunch" that a claimant left her job as a result of winning the lottery. *See* 64 F.3d 335, 338 (7th Cir. 1995). In this case, however, the ALJ did not displace medical evidence with speculation about the impact of Claimant's pension. Instead, the ALJ appropriately discussed how both the medical and nonmedical evidence, including Claimant's source of income, do not fully support Claimant's allegations. R. 15–17; 20 C.F.R. § 404.1529(c). The ALJ properly considered Claimant's pension.

### 3.     The ALJ Properly Considered Claimant's Lack of Treatment.

Claimant also argues that the ALJ improperly discounted his testimony based on Claimant's failure to pursue additional treatment, but Claimant has mischaracterized the ALJ's statements. Contrary to Claimant's assertion, nowhere does the decision speculate about Claimant's prognosis or suggest that additional treatment could have returned Claimant to work. Rather, the ALJ concluded that Claimant was actually capable of work, and cited Claimant's dearth of treatment as evidence that his pain was not as severe as alleged. The ALJ noted that Claimant did not use any pain medication for his knee and back problems, and that the nature and frequency of his orthopedic treatment did not support Claimant's allegations. R. 17. These were perfectly appropriate factors to consider in assessing the severity of Claimant's pain. *See* 20 C.F.R. § 404.1529(c).

**B.    The ALJ Properly Analyzed Claimant's Obesity**.

An ALJ must specifically address the effect of obesity on Claimant's impairments. *See* SSR 02-1p (2002); *Villano v. Astrue*, 556 F.3d 556, 562 (7th Cir. 2009).    Failure to explicitly consider the effect of obesity is subject to harmless error review. *Id.*    When the ALJ relies on opinions of doctors who were aware of Claimant's obesity, the impact of obesity is "factored indirectly into the ALJ's decision as part of the doctors' opinions." *Prochaska v. Barnhart*, 454 F.3d 731, 737 (7th Cir. 2006) (quoting *Skarbek v. Barnhart*, 390 F.3d 500, 504 (7th Cir. 2004)).

Here, the ALJ explicitly addressed Claimant's obesity.    R. 13.    Claimant argues that the ALJ should have discussed the effects of obesity on his arthritic right knee, and faults the ALJ for cherry-picking data points where Claimant's BMI was below the obesity level.    But the record supports the ALJ's conclusion that Claimant's weight problem was nonsevere. Claimant was slightly obese in 2008 but showed a trend of weight loss—his BMI measures in 2009 were consistently below the obesity level.    *Id.*    From March 2008 to June 2009, Claimant's weight dropped from 203 to 188 pounds as a result of exercise and diet.    R. 341, 270.    The ALJ validly determined that Claimant's slight and temporary obesity was not a severe impairment.    R.13.    The ALJ also relied on doctors' opinions that considered Claimant's weight.    For instance, Claimant weighed 195 at Dr. Jain's consultative exam, which was roughly the midpoint of Claimant's weight range during the alleged disability

period.  R. 256.  Therefore, the decision also accounted for Claimant's obesity indirectly through doctors' opinions.  *See Prochaska*, 454 F.3d at 737.

**C.     The ALJ Did Not Fail to Consider the Entire Record.**

Finally, Claimant puts forth a potpourri of arguments, under the umbrella assertion that the ALJ "failed to consider the entire record."  Aside from other arguments already rejected above, Claimant argues that the ALJ erroneously failed to consider the most recent medical evidence, as well as certain VE testimony. When assessing what a claimant can do despite his limitations, the ALJ must consider the entire record, including all relevant medical and nonmedical evidence, such as the claimant's own testimony. *See* 20 C.F.R. § 404.1545(a); 20 C.F.R. § 416.945(a)).  That said, the ALJ need not address every piece of evidence or testimony presented, but rather must provide a "logical bridge" between the evidence and the ALJ's conclusions.  *Jones*, 623 F.3d at 1160.

In this case, the ALJ examined the relevant medical and nonmedical evidence from throughout the alleged disability period.  She cited Claimant's most comprehensive consultative examination with Dr. Jain, who found no remarkable abnormalities.  R. 15–16. State agency medical consultants affirmed Dr. Jain's assessment and concluded that Claimant was capable of medium exertion work.  R. 16.  Contrary to Claimant's argument, the ALJ addressed the medical evidence from 2008.  The ALJ noted Claimant's positive reaction to treatment for trigger finger in September 2008, his diagnosis for DVT in September 2008 and treatment up to May 2009, and Claimant's positive treatment for diabetes in November 2008.

R. 16.  Based on the medical evidence, the ALJ determined that Claimant's other ailments,

such as obesity, kidney stones, and diverticulosis, had minimal impact on Claimant's ability

to work.  R. 13, 15–16.  The ALJ did not explicitly address Claimant's alleged migraines, but

the ALJ is not obligated to address every piece of medical evidence,  *Jones*, 623 F.3d at

1160, and Claimant fails to cite any medical evidence regarding migraines.  Overall, the ALJ

thoroughly examined the medical and nonmedical evidence to determine his work capability.

Claimant also argues that the ALJ failed to consider the VE's testimony regarding the

limitations for a person who could lift fifty pounds occasionally and ten pounds frequently;

only stand and/or walk two hours in an eight-hour workday; or is off task sixteen percent of

the time or absent two days a month.  However, these hypothetical limitations were based on

Claimant's testimony regarding his assessment of his capabilities, not the ultimate RFC

finding.  R. 27–57.  The ALJ determined that Claimant's testimony was not fully credible,

and the Court has upheld the ALJ's credibility finding.  The ALJ therefore had no need to

credit the more restrictive hypotheticals on which Claimant relies.

## IV. CONCLUSION

This case presents a very weak disability claim. The ALJ's determination is fully supported by substantial evidence and uncontradicted medical opinions. For the reasons set forth in this opinion, the Court denies Claimant's motion for summary judgment, grants the Commissioner's motion to affirm, and affirms the Commissioner's decision.

SO ORDERED THIS 26th DAY OF JULY, 2011.

_____
**MORTON DENLOW**
**UNITED STATES MAGISTRATE JUDGE**

**Copies sent to:**

John E. Horn
16710 Oak Park Avenue
Tinley Park, IL 60477

Counsel for Plaintiff

Ernest Yi Ling
United States Attorney's Office
219 South Dearborn Street
Suite 500
Chicago, IL 60604

Carole J. Kohn
Assistant Regional Counsel
200 W. Adams Street
Suite 3000
Chicago, IL 60606

Counsel for Defendant